Kostas **MECHMET,** Evangelos Spatoulis, Peter Zografos, Luigi Conenna, Christos Damos, Emmanuel Caldes, Ramon Espejo, Ted Matsoukas, Rafael Gomez, Salvador Espejo and Christ Katsoulos, individually and on behalf of all persons similarly situated,[1] Plaintiffs,

v.

**FOUR SEASONS HOTELS, LIMITED,** a corporation, Four Seasons Hotels, Limited, a corporation d/b/a The Ritz-Carlton Hotel of Chicago, Inc. and The Ritz-Carlton Hotel of Chicago, Inc., Marlene Gaffke and William Karparos, Defendants.

No. 84 C 7341.

United States District Court, N.D. Illinois, E.D.

June 12, 1986.

Jerome H. Torshen, Jerome H. Torshen, Ltd., Maria Pappas Nikolas, Chicago, Ill., for plaintiffs.

---

1. Although plaintiffs have attempted to present this action as a class action the class has never been certified. This court holds that no cause of action can be brought under Count I on behalf of any class members who have not affirmatively opted into the class. 29 U.S.C. § 216(b). The original complaint was filed on behalf of Kostas Mechmet, Evangelos Spatoulis and Peter Zografos. The other named plaintiffs have filed their consent to join as parties to this suit under 29 U.S.C. 216(b).

James N. Karahalios, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.

### I. NATURE OF THE CASE

Plaintiffs, Kostas Mechmet, Evangelos Spatoulis, Peter Zografos, Luigi Conenna, Christos Damos, Emmanuel Caldes, Ramon Espejo, Ted Matsoukas, Rafael Gomez, Salvador Espejo and Christ Katsoulos, bring this suit against defendants, Four Seasons Hotels, Limited, the Ritz-Carlton Hotel of Chicago, Inc. (hereinafter "Ritz-Carlton"), Marlene Gaffke and William Karparos, to recover overtime compensation allegedly due them under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and applicable state minimum wage law, and for damages incurred as a result of disciplinary measures allegedly imposed against them in retaliation for filing this suit, and for breach of contract. Defendant, Marlene Gaffke, has filed a counterclaim against plaintiff, Kostas Mechmet, for assault.

All parties are in agreement as to the pertinent facts.[2] Plaintiffs are employed as banquet waiters in the banquet department of the Ritz-Carlton Hotel and are compensated pursuant to a collective bargaining agreement entered into between the Ritz-Carlton, its employees and the Restaurant Employees International Union ("Union"). The agreement provides that banquet waiters shall receive a daily wage plus a portion of a 16% service charge, which is assessed on each banquet. The service charge is applied to the total amount charged for food and beverages and is distributed equally among all banquet waiters working on the day of the banquet. Counts I and II of plaintiffs' complaint allege that plaintiffs are due overtime compensation under the FLSA, 29 U.S.C. § 207(a), and applicable state law.

Count III alleges violations of plaintiffs' Union contract. The motions which are before the court are the motions of defendants for summary judgment under Counts I, II and III and to dismiss all claims regarding overtime payment pursuant to the applicable provisions of the Portal to Portal Act, 29 U.S.C. § 259.

### II. FACTS

#### THE UNION CONTRACT

Defendants collectively own and operate the Ritz-Carlton Hotel in Chicago. The Ritz-Carlton first opened for business in December of 1975 as a service establishment providing a full range of hotel and restaurant services to the public, including the rental, at retail, of rooms and banquet space and the sale, at retail, of food and services (Gaffke affidavit, ¶¶ 1-2).

A patron wishing to hold a banquet at the Ritz-Carlton begins by contacting the Director of Catering and entering into a written catering contract that designates the type of banquet, the date of the banquet, the number of persons expected to attend the banquet, the type of food and beverages to be served at the banquet, the unit price of each meal, the applicable sales tax and the mandatory service charge (Gaffke affidavit, ¶¶ 5, 8, 9).

The hotel has a staff of chefs, cooks, busboys, bartenders and banquet waiters. The banquet waiters fall into two categories: "steady extra" banquet waiters, who are regular employees; and "extra" banquet waiters, who are hired temporarily to supplement the "steady extra" banquet waiters. There are ten "steady extra" banquet waiters. (Gaffke affidavit, ¶¶ 16, 18; Pollack affidavit, ¶ 8).

Plaintiffs are paid pursuant to a collective bargaining agreement entered into between the Ritz-Carlton and the Union. The Union contract provides a daily wage schedule for banquet waiters, plus the addi-

---

**2.** The parties agree as to the facts underlying Counts I, II and III only, to which the pending motions decided by this opinion are addressed.

tional amount of compensation a banquet waiter receives for working, setting up and cleaning up a banquet. The schedule also delineates the set number of hours a waiter is compensated for each service he per-

forms and the rate of compensation for such service.[3] Banquet waiters also receive as additional compensation a portion of a 16% service charge which is assessed on each banquet pursuant to the Union contract.[4] The 16% service charge is dis-

3. The waiters are paid pursuant to the function or capacity in which they serve. This function rate is based on a stipulated period of time. This period of time is a minimum period, not maximum. The employee is paid at a rate of time and one-half for time spent over the minimum. For example, from 1983 to 1987, the prevailing rates were as follows:

HOTEL EMPLOYEES AND RESTAURANT EMPLOYEES UNION, LOCAL NO. 1, A.F.L.-C.I.O.
AND
HOTEL, MOTEL, CLUB, CAFETERIA, RESTAURANT EMPLOYEES AND
BARTENDERS UNION, LOCAL 450, A.F.L.-C.I.O.

Minimum Wage Scales Effective April 1, 1983, January 1, 1984,
January 1, 1985, January 1, 1986, and January 1, 1987

II. BANQUET EMPLOYEES DAILY WAGE SCALE AND WORKING CONDITIONS

| | | DAILY WAGE RATES EFFECTIVE | | | | |
|---|---|---|---|---|---|---|
| Classification | Hours | 4/1/83 through 12/31/83 | 1/1/84 through 12/31/84 | 1/1/85 through 12/31/85 | 1/1/86 through 12/31/86 | 1/1/87 through 12/31/87 |
| Captain or Hostess: | | | | | | |
| Dinner | 4 | $18.93 | $19.73 | $20.73 | $21.73 | $22.73 |
| Lunch or Breakfast | 3 | 13.98 | 14.58 | 15.33 | 16.08 | 16.83 |
| Waiters or Waitresses: | | | | | | |
| Dinner | 4 | 13.25 | 13.65 | 14.15 | 14.65 | 15.15 |
| Buffet | 4 | 13.65 | 14.05 | 14.55 | 15.05 | 15.55 |
| Lunch or Breakfast | 3 | 10.16 | 10.46 | 10.84 | 11.21 | 11.59 |
| Bus Persons: | | | | | | |
| Dinner | 4 | 12.60 | 13.00 | 13.50 | 14.00 | 14.50 |
| Buffet | 4 | 13.00 | 13.40 | 13.90 | 14.40 | 14.90 |
| Lunch or Breakfast | 3 | 9.73 | 10.03 | 10.41 | 10.78 | 11.16 |
| Cashiers & Food Checkers | 8 | $33.43 | $35.03 | $37.03 | $39.03 | $41.03 |
| One Meal | 3 | 16.72 | 17.52 | 18.52 | 19.52 | 20.52 |
| Set-Up (2 Hrs.) — Time to commence two (2) hours before call-in time for function work | 2 | 5.73 | 5.93 | 6.18 | 6.43 | 6.68 |
| Clean-Up (2 hrs.) — Time to commence when employees are actually allowed to fully clean room after working function | 2 | 6.48 | 6.68 | 6.93 | 7.18 | 7.43 |
| Guests Set-Up or Clean-Up with function | | 100 | 100 | 100 | 100 | 100 |
| Extra Covers | | 45 | 45 | 45 | 45 | 45 |
| Ticket Parties | | 15 | 15 | 15 | 15 | 15 |
| Sweet Table Charge | | 16.00 | 16.00 | 16.00 | 16.00 | 16.00 |
| Gratuity Service Charge | | 16% | 16% | 16% | 16% | 16% |

4. Section C, p. 34, of the Union contract provides: "There shall be a minimum service charge on all banquets which shall be distributed among employees working said banquets. Said charge shall be sixteen percent (16%). In the event the Employer is unable to secure such minimum service charge on banquets, the employees servicing said banquets shall have the privilege of soliciting their own gratuity.

The minimum service charge shall apply on the total amount charged for food and beverag-es. The Employer shall keep a record of amount received from said charge. Such record shall be open to representatives of the Union for examination.

Where beverages on which such a service charge is made and served from a bar, each bartender staffing said bar shall be paid a waiter's or waitress's share of the service charge for beverages from said bar.

Seventy-seven percent (77%) of the service charge shall be divided among the waiters, wait-

tributed among the banquet waiters, bartenders, bus persons, captains and banquet manager. Each banquet waiter receives an equal amount of the 16% service charge regardless of the number of persons he serves (Gaffke dep., pp. 62–64, 72). The amount received by each banquet waiter is not based on the performance of the waiter (Gaffke dep., pp. 64–65). If two separate banquets are held in one evening, the service charges are pooled and divided equally among the banquet waiters, bar persons and bus persons from both banquets (Gaffke dep. at p. 62). Banquet waiters cannot choose the number of hours they work. The banquet manager controls the number of hours of the banquet waiters (Gaffke dep. at 71–72).[5]

Since May, 1976, banquet waiters have often been scheduled to work over forty (40) hours per week (Mechmet affidavit, ¶ 31) and have also served more than fifteen (15) guests at a particular banquet (Mechmet affidavit, ¶ 8). The Union contract limits the number of guests each waiter must serve and provides payment of an extra hour cover for each guest served in excess of fifteen (15).[6]

In addition to specifying wages to be earned by the banquet waiters, the Union contract also provides a grievance procedure that must be followed prior to filing a suit. Specifically, Section 39 provides the following four-step procedure:

"(a) Any employee or one of a group of employees, any Shop Steward, or any Local Union having a grievance shall, within not more than two (2) weeks after the occurrence of the event resulting in the grievance, discuss the matter with the immediate supervisor or department head of the Employer, who will attempt to adjust it within one (1) week thereafter.

(b) If the matter is not satisfactorily resolved in Step (a), the grievance shall within one (1) week be reduced to writing and submitted by a designated representative of the Local Union to the Employer, which shall submit its answer to the Union in writing within one (1) week thereafter.

(c) If the parties fail to reach a settlement of the grievance within the aforesaid time, then the matter shall be submitted to a permanent Joint Grievance Committee composed of two (2) Employer representatives appointed by the Greater Chicago Hotel and Motel Association and two (2) Union representatives. The Joint Grievance Committee shall meet at a mutually convenient time and place, on such regular or special basis as it shall determine, and render its decision or award within three (3) days after the close of the hearing. If the Joint Grievance Committee resolves the dispute by a majority of those present and voting, then such decision shall be final and binding upon the Union, Employer and employee. If the Joint Grievance Committee is deadlocked on the disposition of the dispute, then either party may take the matter to arbitration as provided in paragraph (d) of this Section 39. Nothing contained herein shall authorize the Joint Grievance Committee to alter the terms and conditions of this Agreement or to make a new Agreement.

(d) If the matter is not resolved in Step (c), then either the Local Union or the Employer may refer the matter to arbi-

---

resses, bus persons, and bartenders as above described, and the remaining twenty-three percent (23%) of said service charge shall be divided in accordance with an addendum with the Employer.

There shall be a minimum service charge of fifteen cents ($.15) per drink served at all ticket parties which shall be paid to the waiters or waitresses serving said drinks."

5. At oral argument on April 24, 1986, counsel for defendants acknowledged that banquet waiters are scheduled according to seniority and do

not have the right to select to work at the more expensive banquets.

6. The 1983 to 1987 Union contract specifically provides: "Fifteen (15) guests per waiter or waitress shall be the limit; except at buffets where thirty (30) guests per waiter or waitress shall be the limit. In the event the station exceeds these limits, waiters or waitresses shall be paid forty-five ($.45) per guest in excess of the above limits."

tration by notifying the other of such intention in writing. The parties shall attempt to agree upon an arbitrator within five (5) working days of the delivery of the request for arbitration. If the parties fail to reach agreement on the selection of an arbitrator within said five (5) day period, the party referring the matter of arbitration shall request the American Arbitration Association to submit a list of seven (7) names for consideration as arbitrator. The parties shall alternately strike one name from the list of the proposed arbitrators and the last remaining name shall be that of the arbitrator. The parties shall draw straws to determine who shall strike the first name. The arbitrator so selected shall meet with the respective parties as soon as practicable following his appointment and shall render his decision in writing within thirty (30) days of such hearing. The arbitrator shall be specifically limited to determining issues involving the interpretation or application of the terms of this Agreement (including the Appendices hereto) and shall have no authority to add to or subtract from or change existing wage rates or any of the other terms of this Agreement. The award of the arbitrator shall be final, binding and conclusive on all parties. All expenses incident to arbitration shall be borne equally by the parties."

## III. ISSUES

1. At issue in this case, under Counts I and II, is whether plaintiffs are entitled to overtime compensation for hours worked in excess of forty (40) in a workweek under the FLSA, 29 U.S.C. 207(a). Defendants assert that plaintiffs are commissioned employees under Section 207(i) of the FLSA and are, therefore, exempt from the overtime provision of the FLSA. Although there are administrative opinions concerning the definition of a commissioned employee, this issue is one of first impression before the courts.

2. At issue in this case under Counts I and II is whether defendants reasonably relied on certain administrative opinions interpreting Section 207(i) and are thereby entitled to a good faith defense under the Portal to Portal Act, 29 U.S.C. § 259.

3. At issue in this case under Count III is whether plaintiffs complied with Section 39 of the Union contract or, alternatively, whether the Union breached its duty of fair representation to plaintiffs such that plaintiffs may maintain suit in this court.

## IV. CANONS OF STATUTORY CONSTRUCTION

In construing a statute, the court's first duty is to effectuate the expressed intent of Congress. *Adams v. Morton*, 581 F.2d 1314 (9th Cir.1978). If Congress did not expressly address a particular issue the court must discern the applicable legislative intent by what is necessarily an act of projection, starting from the areas in which legislative intent is readily discernable and projecting to fair and reasonable corollaries of such intent. *U.S. v. Barber*, 476 F.Supp. 182 (D.C.W.Va.1979). The appropriate methodology then is to look to the "common sense" of a statute or regulation, to its purpose, to the practical consequences of the suggested interpretations and to the agency's own interpretation for what light each inquiry might shed. *New York State Commission On Cable Television v. FCC*, 571 F.2d 95, 99 (2nd Cir.1978) *cert. denied*, 439 U.S. 820, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978). While courts are the final authority on issues of statutory construction, *IRS v. Federal Labor Relations Authority*, 717 F.2d 1174, 1177 (7th Cir.1983), considerable deference is to be accorded to the agency's reasonable interpretations of statutory construction. *National Treasury Employees Union v. Federal Labor Relations Authority*, 732 F.2d 703, 705 (9th Cir.1984).

Accordingly, in order to interpret Section 207(i) of the FLSA, consistent with the aforementioned principles, this court must review the legislative intent in enacting the FLSA and the purpose of Section 207(i), all administrative opinions concerning the interpretation of Section 207(i), the plain meaning of the term "commission", if it

has one, and the practical effect or consequences of the suggested interpretations.

## V. THE FAIR LABOR STANDARDS ACT

The Federal Labor Standards Act was enacted in 1938. The basic purpose of the FLSA was contained in Section 2 in the finding and declaration of policy that provided:

Sec. 2.(a) "The Congress hereby finds that the existence in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce. The Congress further finds that the employment of persons in domestic service in households affects commerce.

It is hereby declared to be the policy of this Act, through the exercise by Congress of its power to regulate commerce among the several States and with foreign nations, to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power."

By enacting the FLSA Congress provided assurances to millions of workers that they would no longer be required to work long hours at low pay, by guaranteeing workers a minimum wage and overtime compensation.[7]

Since 1938 the FLSA has been amended several times. The subject of this lawsuit is the 1961 Congressional Amendment to the FLSA which exempted certain employees from overtime provisions of the FLSA. Specifically, Section 207(i) provides in pertinent part:

"No employer shall be deemed to have violated subsection (a) of this section by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services." [8]

The main purpose of the 1961 amendments was to broaden the scope of the FLSA and to reach some 25 million wage and salaried workers not previously covered by the FLSA. House of Representatives Report No. 75, 87th Congress, 1st Session, P.L. 87–30.[9] The Section 1961

---

7. The overtime provision of the FLSA, 29 U.S.C. § 207(a), provides:

"... No employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce for a workweek longer than forty (40) hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

8. It is not disputed that these two requirements have been met if we determine that the "16% service charge" is, in fact, a commission.

9. President Kennedy stated (as a Senator), "Conscience and good business sense join in demanding the enactment of the measure. The bill will extend to the lowest paid worker in the country a fairer opportunity to share our high standard of living. To pass them by shocks the conscience of those who care.

The increase in purchasing power resulting from a higher minimum wage will help to restore consumer demand to put our idle industrial capacity back to work; and what is equally important, it will serve as a source of protection to employers who pay a decent wage and who must compete with employers who pay a substandard wage." Report to Senate No. 145, P.L. 87–30.

amendments did not, however, extend the protection of the FLSA overtime provision to exempt hotel and restaurant employees. In fact, it was not until January 1, 1979 that hotel and restaurant employees were subject to the regular forty (40) hour standard under Section 207(a) of the FLSA.[10] Since employees like plaintiffs were exempt from the FLSA overtime provisions in 1961 when the commissioned employee exemption was enacted, the legislative history of the 1961 amendment sheds no light on the issue of whether Congress considered banquet waiters as commissioned employees under the FLSA. Congress, obviously, did not have plaintiffs in mind when the commissioned employee exemption was enacted. Moreover, the legislative history contains no mention of why Congress adopted the commissioned employee exemption and it is, therefore, difficult to determine whether Congress would have considered plaintiffs commissioned employees if the plaintiffs were not otherwise exempt from the overtime provisions of the FLSA.

## VI. ADMINISTRATIVE OPINIONS

On October 1, 1975, the following letter was written to the Department of Labor, Wage and Hour Division, on behalf of the American Hotel and Motel Association:

"... Our questions involve proposed arrangements whereby the waiter employed by a retail or service establishment (hotel, motel or restaurant) would be paid on a commission basis and the two statutory requirements of Section 7(i) would be complied with:

1. The "regular rate" of pay of such employee must be more than one and one-half times the minimum hourly rate applicable to him under Section 6 (in this case not less than $3.01 an hour); and

2. More than half his compensation for a "representative period" (not less than one month) must represent commissions on goods and services.

First, a waiter's total earnings, like other commission employees, would depend on the number of covers, value of entrees, food, wine, drinks, desserts, etc., he would be able to sell, plus the quality of service, to his customers and his commission total earnings would reflect his selling and service ability.

Second, a waiter is paid a salary; but, like other commission employees, more than half his compensation is received from a service charge, the value of which depends on the number of covers, value of entrees, food, wine, drinks, desserts, etc., he would be able to sell to his customers. His total commission earnings would be substantially influenced by his ability to sell plus the quality of his service.

Would such proposed commission arrangements be in compliance with the requirements of Section 7(i) of the Act?"

In response to that inquiry, in an Opinion Letter, dated March 26, 1976, the Wage and Hour Administrator stated:

"This is in reply to your letter of October 1, 1975, in which you ask if the proposed method of payment satisfies the requirements of section 7(i) of the Fair Labor Standards Act. Under the plan, waiters (and waitresses) employed by a hotel, motel or restaurant will be paid a salary plus a commission based on a charge for service levied on the customer.

As you are aware, section 7(i)(1) applies on a workweek basis whereas the test of 7(i)(2) is applied over a representative period. Based on our review of the information available, it would be our position that the section 7(i) exemption would be applicable to the employees in question provided that they receive, free and clear, for each workweek in which the exemption may apply, in excess of one and one-half times the minimum hourly rate applicable to them (presently $3.31 an hour), and provided further, that

10. For the legislative history of the Hotel and Restaurant Employee exemption, FLSA, P.L. 87–30; 75 Stat. 75; FLSA Amend. P.L. 89–601, 80 Stat. 833; FLSA Amend., P.L. 93–259, 88 Stat. 64; FLSA Amend. P.L. 95–151, 91 Stat. 1252.

more than one-half their compensation during the representative period (not less than one month) represents commissions. It should be noted that in any situation where the employee's commissions seldom or only infrequently exceed the salary, serious doubts would be raised as to the bona fides of the commission arrangement.

In stating that the proposed payment plan appears to meet the requirements of section 7(i), we assume that the commission basis of payment you refer to is a service charge and not tips. We believe that a service charge, of which all or part is paid directly to service employees, is a 'commission' for purposes of section 7(i), because it is keyed to sales in the sense that it bears a direct relationship to the goods and services which an establishment sells. It is a specific percentage of the bill which the customer is required to pay. We do not believe that tips are commissions for the purposes of section 7(i). Moreover, tips are creditable as wages only to 50% of the minimum wage.

The above position is, of course, predicated on the employing establishment qualifying as a retail or service establishment within the definition and contemplation of the last sentence in section 13(a)(2) of the Act." [11]

Additionally, defendants in this case unilaterally sought an "opinion" from the Department of Labor.[12] The letter basically relayed the defendants' version of the facts of this case and concluded:

"On the basis of all of the foregoing, the Ritz-Carlton Hotel believes that its banquet waiters are commissioned employees that fall within section 7(i) of the FLSA and, as such, are exempt from the overtime provisions of the Act. It is believed that this position is consistent with the statutes and the Wage and Hour position expressed in the two foregoing Opinion Letters. This belief is also held because the Hotel underwent full audits by Wage and Hour in 1980 and in 1984 and were notified that the Hotel was in compliance.

In response to this letter, defendants were informed:

"If the hotel's method of paying banquet servers operates, in fact, as described in your letter and in the collective bargaining agreement, and if it is fully in accord with the principles set forth in the above-cited sections of 29 C.F.R. Part 779, it is our opinion that the banquet servers may qualify for the exemption contained in section 7(i) of FLSA."

### VII. MEANING OF TERM "COMMISSION"

#### A. DICTIONARY DEFINITIONS

Black's Law Dictionary (5th ed.) defines a commission as "the recompense, or reward of an agent, salesman, executor, trustee, receiver, factor, broker or bailee when the same is calculated as a percentage on the amount of his transactions or on profit to the principal", at p. 246.[13] Webster's Dictionary defines a commission as a "fee paid to an agent or employee for transacting a piece of business or performing a service, especially a percentage of the money received from a total paid to the

---

**11.** CCH, Labor Law Reports, Wages-Hours, Administrative Rulings, Opinion Letter No. 1432 (WH–379), ¶ 31, 037. The plaintiffs point out that the factual context upon which this opinion is based is materially different from the subject situation. In the Opinion the waiters are assumed to perform a very real sales function, i.e., sales of drinks, food, etc.

**12.** The court recognizes that this Opinion is in no way binding. The Opinion was sought after this lawsuit was filed and the Department of Labor was not presented the plaintiffs' pleadings. While we do not condone this procedure, the court will consider this Opinion Letter, taking into account plaintiffs' warranted objections. The court will not, however, consider the self-serving assertion that defendants' counsel spoke with Attorney Secares, of the Department of Labor, which is referred to at p. 7 of defendants' memorandum. The statement is not verified and is hereby stricken.

**13.** This definition was adopted by the Illinois Supreme Court in *Commonwealth Life & Accident Ins. Co. v. Board of Revenue of Dept. of Labor*, 414 Ill. 475, 111 N.E.2d 345, 350 (1953).

agent responsible for the business", n. 6, p. 265, *Webster's Ninth New Collegiate Dictionary.*

## B. FEDERAL REGULATIONS

Section 779.414 of the federal regulations describes the types of employment in which the commissioned employee overtime exemption may apply. Specifically, Section 779.414 provides:

"Section 7(i) was enacted to relieve an employer from the obligation of paying overtime compensation to certain employees of retail or service establishments paid wholly or in greater part on the basis of commissions. These employees are generally employed in the so-called big ticket departments and those establishments or parts of establishments where commission methods of payment traditionally have been used typically with those dealing in furniture, bedding, home furnishings, floor coverings, draperies, major appliances, musical instruments, radios and television, men's clothing, women's ready-to-wear, shoes, corsets, home insulation, and various home custom orders." 29 C.F.R. § 779.414 (1984).

Section 779.414 also indicates that there may be other segments in retailing where the proportionate amount of commission payments would be great enough for employees in such segments to come within the exemption. 29 C.F.R. § 779.414 (1984).

## C. SERVICE CHARGE DOES NOT EQUAL A TIP

Plaintiffs object to defendants' use of the word "commission" to describe the service charge. Plaintiffs assert that prior to this lawsuit defendants did not refer to the service charge as a commission.[14] Plaintiffs point out that even the Union contract refers to the service charge as a gratuity. However, it is clear that the service charge is not a gratuity. 29 C.F.R. § 531.52 indicates that the Unions' characterization of

the service charge as a gratuity is incorrect. Specifically, Section 531.52 provides:

"A tip is a sum presented by a customer as a gift or gratuity in recognition of some service performed for him. It is to be distinguished from payment of a charge, if any, made for the service. Whether a tip is to be given, and its amount, are matters determined solely by the customer, and generally he has the right to determine who shall be the recipient of his gratuity. In the absence of an agreement to the contrary between the recipient and a third party, a tip becomes the property of the person in recognition of whose service it is presented by the customer. Only tips actually received by an employee as money belonging to him which he may use as he chooses free of any control by the employer, may be counted in determining whether he is a "tipped employee" within the meaning of the Act and in applying the provisions of section 3(m) which govern wage credits for tips[.]"

Further, Section 531.55(a) of the federal regulations also explicitly states that a service charge such as the one in this case is not a gratuity. Specifically, Section 531.-55(a) provides:

"... where negotiations between a hotel and a customer for banquet facilities include amounts for distribution to employees of the hotel, the amounts so distributed are not counted as tips." 29 C.F.R. 531.52 (1984).

## VIII. PRACTICAL EFFECT OF SUGGESTED INTERPRETATIONS

At oral argument on April 24, 1986, counsel for both parties acknowledged that if this court was to conclude that the service charge is not a commission that such a holding would have a tremendous impact on the entire hotel and motel industry. Plaintiffs' attorney urged the court not to consider the possible ramifications of hold-

---

**14.** It appears to the court that defendants and the Union probably did not contemplate the overtime problem when the collective bargaining agreement was negotiated. This, however, does no more mean that the percentage compensation is not a "commission" than it does mean that it is a "gratuity" which, as pointed out, *infra,* it clearly is not.

ing that the service charge is not a commission [15] but he did concede that such a decision would potentially hurt some banquet waiters. Defendants' attorney insisted that if this court held that the service charge was not a commission then the defendants would be forced to resort to part-time help, thereby injuring both defendants and plaintiffs. He argued that the plaintiffs could not expect to earn the amount of money they currently earn if they were forced to work less than forty (40) hours per week. Moreover, he asserted that the Ritz-Carlton would suffer if it was forced to resort to part-time help as it would not retain the loyalty of its employees. He explained that the Ritz-Carlton's specialty is the unique quality of its services and if it were forced to hire part-time help from a pool of available banquet waiters that it would have service identical to all Chicago hotels and would lose its individuality. He also pointed out that since the banquet waiters, through their Union representatives, negotiated this type of remuneration they should be considered to favor the exemption.

## IX. ANALYSIS

### A. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND II

The common definition of commission, legislative intent in enacting the FLSA, administrative interpretations of Section 207(i), and practical considerations, compel the conclusion that the service charge in this case is a commission and, therefore, plaintiffs are commissioned employees under Section 207(i).

15. This court agrees with plaintiffs that the anticipated effect of its holding should not be determinative on the ultimate issue as to whether or not defendants have violated the FLSA. However, the practical effect of the suggested interpretations is a consideration in determining whether plaintiffs are commissioned employees under the FLSA. See *supra*, IV. For example, would Congress have meant to exclude banquet waiters from § 207(i) of the FSLA had it considered the ramifications?

█ The method of payment utilized by the defendants comports with the plain meaning of the term "commission". It appears that from the various definitions and use of the term "commission", the single common thread is that the remuneration is based on a fixed percentage of a variable amount, usually either gross or net, to the employer or principal rather than upon hours worked. In other words, payment of services is measured in direct proportion to the value of the final product sold by the employer. In this case, the compensation paid to the plaintiffs and the other banquet waiters is variable and is based on a fixed percentage of the gross received by the defendants. The method of payment is not based on hours worked but rather is based directly on the value of the entire product, i.e., the "banquet", to the employer. In sum, the service charge constitutes a recompense calculated as a percentage on the amount of the transactions of the defendant and thereby meets the commonly accepted definition of a commission. See, *supra*, Section VII.

Plaintiffs argue that the subject recompense fails to meet the definition of commission because plaintiffs have no sales function with regard to defendants' banquets.[16] While this is a common characteristic of commission pay, e.g., real estate brokers, appliance salesmen, etc., nevertheless, other occupations that commonly receive "commissions" listed in Black's Law Dictionary (e.g., executors, trustees and receivers) do not have a "sales" function.

Moreover, the hotel and motel banquet industry fits the "big ticket" department description contained in the federal regulations. The financial statement attached to the parties' briefs indicate that, on an aver-

16. Defendants unpersuasively argue that plaintiffs do have a sales function through their skilled handling of a banquet. This function, however, is clearly post-facto. In fact, the defendants pay a separate 2% commission to the agent responsible for the sales. The plaintiffs serve only what has been ordered previously by the customer.

age, these banquets cost thousands of dollars. The cost of a banquet is equivalent to the cost of any of the delineated "big ticket" items under the federal regulations. The service charge, therefore, fits the purpose of the commission exemption as set out in the federal regulations.

The legislative intent in enacting the FLSA also supports our conclusion that plaintiffs are commissioned employees. It cannot be disputed that the legislative intent in enacting the overtime provisions of the FLSA was to spread employment through imposing the overtime pay requirement and to compensate employees for the burden of working in excess of forty (40) hours. *Jewell Ridge Coal Corp. v. Local No. 6167 United Mine Workers of America,* 325 U.S. 161, 167, 65 S.Ct. 1063, 1066, 89 L.Ed. 1534 (1945). However, it is clear that Congress did not seek to achieve these goals at all costs. Rather, Congress specifically added the proviso to its statement of purpose that while it sought to eliminate the evils of certain outlined conditions it sought to do so without *substantially curtailing employment* or *earning power,* 29 U.S.C. 201, *et seq.*

Plaintiffs' earning power could be substantially curtailed if this court held that plaintiffs are not commissioned employees. The collective bargaining agreement executed by the parties effectively ties the banquet waiters and the hotel together so that the earnings of both are dependent upon the financial success of the banquet. The more successful the banquet, the more money the employer grosses and the more money the employee earns. The less successful the banquet, the less money the

employer grosses and the less money the employee earns. This is the way the system operates. The employees' work schedule is also dependent upon the variable schedules set up by the hotel's sales people. There is no way to average and force the banquet waiters' hours to fit into a forty (40) hour week. Hence, if this court was to hold that the employees are entitled to overtime pay for hours worked in excess of forty (40), the employers would be provided a disincentive to allow the employees to work in excess of forty (40) hours and the employers would restrict the employee's workweek to forty (40) hours. The result would be that the employees could not earn as much money as they currently earn.[17] For example, the chart below indicates that in a 4–week span three of the plaintiffs' hours varied to such an extent that at times they were far below forty (40) hours and at other times they were far above.[18] If this court held that the employees are not commissioned employees under the FLSA these employees would have no way to offset the weeks in which they worked less than forty (40) hours. In effect, this court could be curtailing these employees' right to earn a living, thereby disregarding the explicit legislative intent in enacting the FLSA overtime provisions.

Also, in support of our finding, the Department of Labor has concluded that the service charge in this case constitutes a commission. It is well settled that a District Court should give deference to an agency's determination or construction of a statute if the opinion is reasonable. While this court does not condone the method by which the opinion was requested, this court

---

17. Plaintiffs' attorney at the oral argument candidly agreed that his clients might suffer financially should they be successful in this suit.

18. This chart was presented to the court by way of affidavit of Marlene Gaffke, Director of Catering.

MECHMET

| Week of | Wages | Comm. | Hrs. |
|---|---|---|---|
| 9/03 | 123.81 | 280.51 | 29 |
| 9/10 | 179.30 | 630.00 | 53 |
| 9/17 | 191.46 | 468.76 | 54 |
| 9/24 | 169.29 | 766.29 | 51 |

ZOGRAFOS

| Week of | Wages | Comm. | Hrs. |
|---|---|---|---|
| 9/03 | 113.35 | 235.76 | 26 |
| 9/10 | 155.19 | 645.81 | 46 |
| 9/17 | 192.50 | 607.15 | 57 |
| 9/24 | 144.73 | 577.61 | 45 |

SPATOULIS

| Wages | Comm. | Hrs. |
|---|---|---|
| 134.27 | 242.60 | 32 |
| 199.18 | 671.43 | 59 |
| 78.56 | 265.77 | 23 |
| — | — | — |

cannot presume that the opinion does not reflect the view of the Department of Labor. Therefore, this court's determination that the service charge is a commission is consistent with the position of the Department of Labor.

Finally, if this court determined that the service charge is not a commission a degree of uncertainty and unfairness would be invoked into an otherwise well-balanced and fairly negotiated collective bargaining agreement. Specifically, the employees bargained to have their pay dependent on the economic benefit realized by their employer from their services. The agreement helps the employer calculate and predict the cost of each banquet and the cost of his labor force, which is a major component. If some employees were entitled to overtime compensation the employer could not predict, in advance, the cost of a particular banquet. Rather, the employer would not know until the day of the banquet what his labor costs would be and, therefore, could not pass these costs on to the customer. Further, inequities would exist among the employees as the agreement provides all employees earn an equal portion of the 16% service charge. If some employees were earning time and a half in addition to the service charge, the bargained for equality would be destroyed. Moreover, it would be unfair if some banquet waiters earned time and a half on an expensive banquet while other banquet waiters earned their time and a half on an inexpensive banquet.

Accordingly, this court finds that the method of payment selected by the parties fits within the common definition of the term commission and also passes muster under the federal regulations. Furthermore, while the ultimate interpretation rests with this court, a holding that the plaintiffs are commissioned employees is consistent with the Department of Labor's interpretation of this situation. Finally, the practical considerations favor the conclusion that plaintiffs are commissioned employees. A finding that the employees are not commissioned employees would create wholly unexpected liabilities and grant plaintiffs benefits not due them under either their contract or the FLSA.

Since the plaintiffs do not assert that the two conditions in Section 207(i) are not met if the service charge is a commission, summary judgment is granted in defendants' favor under Counts I and II.

## B.  COUNT III

The Seventh Circuit has consistently held that a union does not breach its duty of fair representation by merely failing to process an employee's grievance. *Hoffman v. Lonza, Inc.*, 658 F.2d 519 (7th Cir.1981). Rather, the Seventh Circuit has held that a Union breaches its duty of fair representation when Union conduct is intentional, invidious and directed at the employee. *Hoffman*, 658 F.2d at 502; *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971). As recently as February 3, 1986, in *Camacho v. Ritz-Carlton Hotel*, 786 F.2d 242 (7th Cir., 1986), the Seventh Circuit held that perfunctory handling of a potentially meritorious grievance is insufficient grounds for bringing a case in Federal Court under Section 301 of the Labor Management Relations Act (hereinafter "LMRA"), 29 U.S.C. § 185. The Seventh Circuit, citing *Dober v. Roadway Express, Inc.*, 707 F.2d 292, 294, reasoned that "if perfunctory representation defeats rather than implements the wishes of the employees they may install a new team of grievers", *Camacho*, at p. 245. The court affirmed the District Court's holding that perfunctory representation is a long way from the intentional misconduct required by *Hoffman*. The court defined intentional misconduct as conduct that "sabotages" a possibly meritorious grievance ... because the worker is on the outs with the Union or is a member of some racial or other minority or is not a Union man. *Dober*, 707 F.2d 292, 294.

█ In the case at bar, plaintiffs have failed to allege a breach of the Union's duty of fair representation [19] or that they

---

19. Plaintiffs do not allege a breach of the Union's duty of fair representation and do not name the Union as party-defendant. Paragraph

13 merely alleges that plaintiffs "complained and protested to *defendants*" (emphasis supplied) regarding the violation of the collective

have attempted to follow the grievance procedure set out in the collective bargaining agreement. Even if plaintiffs did allege a breach of duty of fair representation there is no evidence that the conduct of the Union was intentional, invidious or directed at the plaintiffs. *Hoffman*, 658 F.2d at 520. The plaintiffs merely assert that once the plaintiffs informed the Union of their complaints that the Union had the responsibility of processing their complaints and that the Union failed to pursue the complaints through the grievance process. Under *Hoffman* these allegations of perfunctory handling of a claim without intentional misconduct do not constitute a breach of the Union's duty of fair representation. Therefore, summary judgment is granted in favor of defendants under Count III.

### C. MOTION TO DISMISS COUNTS I AND II

Having resolved the issue of whether plaintiffs are exempt from the overtime provisions of the FLSA in defendants' favor, it is not necessary to consider the merits of the good faith defense raised by the defendants in their motion to dismiss Counts I and II.

### X. CONCLUSION

This court grants summary judgment in favor of the defendants under Counts I, II and III. The service charge is a commission under Section 207(i) of the FLSA and plaintiffs are exempt from overtime payments. The plaintiffs have not exhausted their remedies under the Union agreement and the Union has not breached its duty of fair representation. Counts IV through VII and the counterclaim remain.

IT IS SO ORDERED.

bargaining agreement. Plaintiffs do not allege that they attempted to follow the grievance procedure.